IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ASSOCIATION OF TAXICAB OPERATORS, USA, | § § § | |
| Plaintiff, | § § § | CIVIL ACTION NO. |
| v. | § | 3:10-CV-769-K |
| | § | |
| CITY OF DALLAS, | § § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion for Final Summary Judgment (Doc. No. 45).  The Court has considered Defendant City of Dallas' ("the City") Motion, the City's Brief in Support of its Motion for Final Summary Judgment, Plaintiff, the Association of Taxicab Operators, USA's ("ATO") Response and Memorandum in Support, the City's Reply Brief, the evidence submitted by the parties, and applicable law.  The City asserts that as a matter of law, Dallas City Ordinance No. 27831 (the "Ordinance") is not preempted, while ATO asserts that the Ordinance is preempted by the Clean Air Act. Because no genuine issue of material fact exists as to the lack of preemption of the Ordinance by the Clean Air Act, the City's Motion for Final Summary Judgment is hereby **GRANTED**.  Judgment will be entered by separate document.  Fed. R. Civ. P. 58(a).

## I.    Factual Background

On March 10, 2010, the City adopted Ordinance No. 27831 (the "Ordinance"),

with an effective date of April 10, 2010.  The Ordinance amended Sections 5-58 and 5-59, and added a new Section 5-61.1, to Chapter 5 of the Dallas City Code entitled "Aircraft and Airports."  The Ordinance creates an incentive for a taxicab designated as a "dedicated compressed natural gas vehicle" ("CNG taxicab").

A CNG taxicab is defined in the Ordinance as "a vehicle that operates exclusively on compressed natural gas."  Dallas City Code, § 5-58(9).  A taxicab owner can either purchase a new vehicle that is already equipped with a compressed natural gas system or can convert an existing cab to operate on compressed natural gas.  "Head of the line" privileges are issued to CNG taxicabs, which means that if a CNG taxicab has been issued an emblem by the City's Director of Aviation, and is otherwise permitted by the City, then it is entitled to advance to the front of the taxicab holding or dispatch area at Love Field (owned by the City) ahead of non CNG taxicabs who may be waiting to pick up passengers at the Airport.  Dallas City Code, § 5-61.1.

The Ordinance does not apply to any property or areas located within the City outside of Love Field.  At Love Field, non CNG taxicabs are free to drop off passengers without having to wait in the central holding area because the Ordinance only applies to taxicabs picking up passengers at the airport.  Moreover, if a taxicab driver has made prior arrangements to pick up a passenger, the system of waiting in line at a central queue likewise does not apply.

On April 15, 2010, ATO filed its Original Verified Complaint against the City

alleging the City's actions are preempted by the Clean Air Act.  ATO asserts the CNG preference is a "standard relating to the control of emissions from new motor vehicles." *See* Clean Air Act § 209(a), 42 U.S.C. § 7543(a).  Thus, according to ATO, the City's regulation is preempted by Section 209(a) of the Clean Air Act, which states: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."  *Id*.

This Court entered a temporary restraining order ("TRO") on April 15, 2010, enjoining the City from allowing taxicabs at Love Field which utilize dedicated CNG powered engines to be given "head-of-the-line" privileges at any taxicab holding or dispatch area.  A preliminary injunction hearing was then held on May 4, 2010.  After determining that ATO's arguments supporting preemption failed, and ATO could not establish a likelihood of success on the merits, the Court denied ATO its request for a preliminary injunction by order dated August 30, 2010.  ATO appealed the order to the Fifth Circuit, but the appeal was dismissed for want of prosecution, as ATO failed to timely file its brief and record excerpts.  *See* Doc. No. 39.  In August of 2011, the City filed the motion for summary judgment that is now before the Court.  No new material facts have come to light since the Court issued its Preliminary Injunction Order in August of 2010.

## II.     Summary Judgment Standard

"Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Triple Tee Golf*, 485 F.3d at 261 (citing *Celotex*, 477 U.S. at 322 25).  The burden then shifts to the non-moving party to show the existence of a genuine issue of material fact for trial. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).

A dispute of a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon*, 560 F.3d at 326 (quoting *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)).  All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant, and all disputed facts resolved in favor of the nonmovant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005); *see also Sossamon*, 560 F.3d at 326.

III.    **Analysis**

A.    **Introduction**

The City's Motion for Summary Judgment argues that it is entitled to final summary judgment as to all of ATO's claims.   ATO's Verified Complaint seeks a declaratory judgment, a permanent injunction, and impliedly seeks attorneys' fees.  "The party seeking a permanent injunction must meet a four-part test.  "It must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest."  *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006).  Regarding declaratory relief, ATO apparently relies on 28 U.S.C. § 2201: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

No factual discrepancies presented by the parties need be settled by the Court in order to address the City's Motion for Summary Judgment.  This case rests on one issue—preemption.  Plaintiff's Response to Defendant's Motion for Summary Judgment concisely states the central issue before the Court—whether "the CNG Preference is preempted by the Clean Air Act."  Thus, ATO's request for injunctive relief and declaratory judgment, and the motion now before the Court, hinge on the issue of

preemption.  The Court discussed preemption of the Ordinance by the Clean Air Act in detail in its Preliminary Injunction Order (Doc. No. 30).  Neither party has presented any new arguments in their summary judgment briefing that would alter the Court's position on preemption.  Rather, this Court's Preliminary Injunction Order is incorporated, and the Court will restate only so much of the analysis as is required to dispose of ATO's arguments on this Motion.

## B.    The Issue of Preemption

### 1.    Congressional Purpose

Section 209(a) states: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."  42 U.S.C. § 7543(a).  "In all preemption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation and internal quotation marks omitted).  In undertaking this analysis, "Congressional purpose is the 'ultimate touchstone' of our inquiry."  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)).  Plaintiff contends that no deference is due the City Ordinance, because it allegedly does not touch on the historic police powers of the State,

and Section 209(a) makes clear that preemption was the clear and manifest purpose of Congress. The Court rejects this argument.

Texas state law authorizes cities such as Dallas to regulate taxicabs and the Dallas City Charter grants the City the authority to regulate vehicles for hire and also permits the City to grant franchises to those companies using its streets and roadways. Tex. Loc. Gov't Code § 215.004; *see* Dallas City Charter § 13; Dallas City Charter Ch. XIV. Dallas regulates the taxicab industry through Chapter 45 of the Dallas City Code and has regulated taxicabs for decades.

Even looking at the broader automobile industry, Section 209(d) preserves state and local authority over use and operations of vehicles. 42 U.S.C. § 7543(d). As the D.C. Circuit has observed, "the longstanding scheme of motor vehicle emissions control has always permitted the states to adopt in use regulations-such as carpool lanes, restrictions on car use in downtown areas, and programs to control extended idling of vehicles-that are expressly intended to control emissions." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1094 (D.C. Cir. 1996). Here, the City has created an incentive for taxicabs to use CNG powered engines to reduce problems such as "smog, haze, and health issues." Dallas Ordinance No. 27831.

In enacting Section 209, Congress was careful to distinguish between state and local measures governing the use of automobiles (even outside the scope of the closely regulated taxicab industry) and measures that would regulate emissions characteristics

of new vehicles in a way that would effectively mandate manufacture of a distinct type of vehicle.  Congress was at pains to make clear that only the latter type of measures fall within the express statutory preemption provision.  As the Senate Report explained, the statute provides "for Federal preemption of the right to set standards on new motor vehicles and new motor vehicle engines only," while including "[s]pecific language indicating the committee's position on the rights of the States to control the movement, operation, and use of licensed or registered vehicles."  S. Rep. No. 90-403, at 34 (1967).  As the report emphasized, "[t]his language is of particular importance," noting that "any significant advance in control of used vehicles would result in a corresponding reduction in air pollution," and that "[t]hese are areas in which the States and local government can be most effective."  *Id*.; *see also* H.R. Rep. No. 90-728, reprinted in 1967 U.S.C.C.A.N. 1938, 1957 (discussing what is now Section 209 of the Clean Air Act and noting that "[t]he ability of those engaged in the manufacture of automobiles to obtain clear and consistent answers concerning emission controls and standards is of considerable importance so as to permit economies in production," indicating the limited function of this provision); 42 U.S.C. § 7401(a)(3) (finding that "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments").

        This is consistent with the structure of the Clean Air Act as a whole, which largely

preserves the traditional role of states in controlling air pollution. *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1042 (9th Cir. 2007); *see Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power"); *see also Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 350 (D. Vt. 2007) ("Congress acknowledged that the regulation of air pollution from mobile sources was traditionally a state responsibility."). After thorough review of the Congressional history of Section 209 of the Clean Air Act, it is apparent that the Congressional purpose of Section 209 was only to assure national uniformity of emissions standards by preempting enforceable standards that relate to the control of emissions for new motor vehicles or new motor vehicle engines.

## 2.   Meaning of "Standard" Under Section 209(a)

To conclude that the Ordinance is preempted would also require this Court to expand Section 209(a) beyond its focus on enforceable standards of the type contemplated by the statute. As the Supreme Court noted in *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252-53, 255 (2004), in interpreting the scope of Section 209(a), due weight must be given to the provision's use of the phrase "attempt to enforce" and its implications for the meaning of "standard." The Court in that case concluded that a rule cannot escape preemption of the Clean Air Act merely

because it addresses the purchase of vehicles, rather than their manufacture or sale.  The Court reasoned that "[a] command, accompanied by sanctions, that certain purchasers may buy only vehicles with particular emission characteristics is as much an 'attempt to enforce' a 'standard' as a command, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume must consist of such vehicles." *Id*. at 255.  As the Court stressed, that reasoning did not require the conclusion that Section 209(a) preempts "voluntary incentive programs," explaining that "[i]t is at least arguable that the phrase 'adopt or attempt to enforce any standard' refers only to standards that are enforceable." *Id*. at 258.

As is readily apparent from the Supreme Court's discussion of the enforcement of "standards" in *Engine Mfrs.*, Congress used those terms throughout Title II to refer to enforceable requirements to manufacture vehicles with particular kinds of emission controls or particular emissions levels or, alternatively, enforceable requirements to purchase vehicles with particular kinds of emission controls or particular emissions levels.  Plaintiff asserted in its Response that "nothing in the words of § 209(a) supports such a narrow construction of this decidedly broad statute."  However, where a regulation "neither dictates permissible pollutant levels nor mandates emission control technology," it is not a "standard" under Section 209 of the Clean Air Act.  *See Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, No. CV F 07-0820 LJO DLB, 2008 U.S. Dist. LEXIS 70931, at *35 (E.D. Cal. Sept. 18, 2008).

Here, an incentive program like the Ordinance, unlike a command to purchase or manufacture vehicles with particular kinds of emission controls, is not an enforceable requirement with respect to emissions. Taxicab owners and drivers can still choose what type of vehicle to use. Additionally, they are not bound by the Ordinance anywhere in the City, except at Love Field. The Ordinance is ultimately not a "standard" pursuant to Section 209 and merely incentivizes taxicab owners and drivers.

### 3.   Incentives Versus "Standards Relating to Control of Emissions"

Plaintiff asserts that the only means of obtaining a CNG vehicle is by purchasing a new engine and, therefore, falls into the purview of Section 209(a)'s preemption provision concerning "new motor vehicles or new motor vehicle engines." Plaintiff neglects the remainder of the section. Section 209(a) states: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." 42 U.S.C. § 7543(a). An adoption or an attempt to enforce a *standard* relating to emissions is also required.

ATO relies on *Engine Mfrs*. to argue that the Ordinance imposes a standard by requiring taxicabs to obtain a certain type of "pollution-control device . . . or design feature related to the control of emissions." However, the Ordinance does not require taxicab drivers to purchase a new taxicab or engine, but allows CNG taxicabs to obtain head-of-the-line privileges. The Ordinance incentivizes, but does not enforce. By their

-11-

very nature, incentive programs lack the kind of enforceable requirements that are characteristic of standards.  This incentive Ordinance is no different. The Ordinance does not mandate quantitative emissions levels, establish manufacturer requirements, establish purchase requirements, mandate emissions control technology, or establish a penalty or fee system; therefore, the Ordinance is not a standard under Section 209(a) of the Clean Air Act.

### 4.    Incentives are Distinguished in *Metro. Taxicab* Case

ATO relies on *Metro. Taxicab Bd. of Trade v. City of New York* to contend that the Ordinance directly regulates the relevant preempted subject matter.   However, the present case is inapposite to *Metro. Taxicab*, because in that case the City of New York's regulation differs from the Ordinance in the lawsuit before this Court.  In *Metro. Taxicab*, New York passed rules affecting a taxicab driver's lease rates.  633 F. Supp. 2d 83, 85 (S.D.N.Y. 2009).  Under the new rules, if an owner purchased a taxicab with a hybrid or clean-diesel engine, the rate at which the vehicle could be leased to a driver for a twelve-hour shift is increased by three dollars.  *Id*.  By contrast, an owner's maximum lease rate that could be charged for other taxicab vehicles  (non-hybrid, non-clean diesel engine, non-wheel chair accessible) was reduced by four dollars in May 2009, then by eight dollars in May 2010, and twelve dollars in May 2011.  *Id*.  Importantly, the court in *Metro. Taxicab* explicitly pointed out "what this case is not about." *Id*. at 87 (emphasis added).  The court stated:

> Nor is there a question whether New York City can incentivize the purchase of certain types of taxicabs. Several years ago the City issued new taxi medallions which were limited to hybrid vehicles. See N.Y. City Administrative Code § 19-532(b) (2003). There was no challenge to the incentive. Recently the City extended the service life of hybrid vehicles from three to five years. *Id*. § 19-535(b) (2006). Again, there was no challenge to this incentive. Similarly, in the present case, Plaintiffs do not challenge the $3 per shift "incentive" increase in lease rates for hybrid taxicabs.

*Id*. at 87. The Second Circuit on appeal, not only affirmed the district court's ruling in *Metro. Taxicab*, but also the district court's statement of what the case is not about. 615 F.3d 152, 155 (2d Cir. 2010), *cert. denied*, 131 S.Ct. 1569 (2011) ("[f]or obvious reasons, the plaintiffs did not challenge the $3 upward adjustment of the lease caps for hybrid taxis, which benefitted them").

There is no question the present case is distinguishable from *Metro. Taxicab*. In *Metro. Taxicab*, the lease caps for non-hybrid, non-clean diesel vehicles were reduced and taxicab owners were effectively punished. Here, taxicabs with CNG powered engines are rewarded with head-of-the-line privileges. An incentive, like the one in this case, was never challenged in *Metro. Taxicab*. Therefore, any reliance on *Metro. Taxicab* is not appropriate, because the present issue was not before the Southern District of New York, nor the Second Circuit. Furthermore, in *Metro. Taxicab*, the rules at issue were citywide. *See generally* 635 F. Supp. 2d 83. Every taxicab operating in the city of New York was affected by the regulation. *See id*. In contrast, the Ordinance at issue in the present case only applies to taxicabs operating at Love Field, not elsewhere in Dallas.

-13-

### 5.    Indirect Economic Effects & the *Travelers* Case

ATO argues that, at a minimum, the Ordinance is preempted because it indirectly regulates the preempted subject matter.  ATO states that "[t]he economic hardship evidenced by the affidavits of non-CNG taxicab drivers demonstrates that the drivers have one, basic option if they wish to remain in business at Love Field: drive a CNG taxicab."  ATO relies on *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* to support the position that even an indirect incentive can become an effective mandate, quoting:

> [W]e do not hold today that ERISA pre-empts only direct regulation of ERISA plans, nor could we do that with fidelity to the views expressed in our prior opinions on the matter.  We acknowledge that a state law might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers, and that such a state law might indeed be pre-empted . . . .

514 U.S. 645, 668 (1995) (internal citations omitted).

ATO does not address the remainder of the *Travelers* opinion.  *Travelers* dealt with a New York state statute that required hospitals to collect surcharges from patients covered by a commercial insurer, but exempted patients insured by Blue Cross/Blue Shield.  *Id*. at 649.  This obviously made Blue Cross/Blue Shield a more attractive option for administrators of employee benefit plans, and other health care insurers argued that the statute was preempted by ERISA in that it preempts all state laws insofar as they "relate to" an employee benefit plan.  *See id*. at 656-59.  "The [Supreme] Court noted

that the law created an 'indirect economic effect' on plan administrators' choices, but that '[a]n indirect economic influence, however, does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself.'" *Metro. Taxicab*, 633 F.Supp.2d at 94 (quoting *Travelers*, 514 U.S. at 659-60).   The Supreme Court determined that the law was not preempted because: "(1) it did not force only one, preempted, choice; and (2) the manner in which the law indirectly affected ERISA plan decisions was not part of Congress' preemptive object." *Id*.   Thus, just as the Court found in *Travelers*, an incentive Ordinance like the one at issue in this case is not preempted merely because it creates indirect economic effects.

Although the Supreme Court left open the question that, conceivably, an incentive could create such acute economic effects as to force (or mandate) a particular method, no facts in this case demonstrate acute economic effects.   The Ordinance only applies to taxicabs operating at Love Field; taxicabs are free to operate throughout the City of Dallas unaffected in any way by this Ordinance.   This case is similar to the fact presented in *Travelers*.   Assuming, *arguendo*, that taxicab drivers have been economically impacted by the Ordinance, that economic influence may affect a taxicab driver's choices in what type of taxicab to drive and where to find business, but does not bind the taxicab driver to purchase a CNG taxicab or prohibit business at Love Field.   The manner in which the Ordinance may indirectly affect the control of emissions is not a part of Congress' preemptive object.   That is, the Ordinance does not preclude the

Congressional purpose of assuring national uniformity of emissions standards for new motor vehicles or new motor vehicle engines.

### 6.   Summary of Reasons for No Preemption

In sum, to find preemption in this case, it would be necessary to conclude: (1) that Congress intended to preempt the key aspects of local regulation of taxi service by municipalities, which have long dictated vehicle requirements with a consequent impact on emissions; (2) that Congress meant to preempt local control of the taxicab industry despite the Clean Air Act authorizing local regulations to reduce vehicle emissions and even though the Clean Air Act regulates the purchase and sale of new vehicles to assure uniformity of standards of manufacturers; (3) that Congress intended preemption despite the strong evidence of Congressional intent to preserve broad State and local authority over use and operation of vehicles; and (4) that regulating taxicab holding and dispatch areas for taxi service constitutes enforcement of standards of the kind contemplated by the Clean Air Act, notwithstanding the strong indications that Congress did not intend to preempt incentive programs under Section 209. ATO argues in its response that the CNG Incentive is either: expressly preempted, field preempted, preempted due to the fact it is a *de facto* mandate, or a preempted "standard." Field preemption occurs when Congress has either expressed a clear intent that federal law will be exclusive in a field or federal regulation evidences a congressional purpose to completely occupy a field. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.*

*Comm'n*, 461 U.S. 190, 204 (1983).  The Court rejects each of ATO's preemption arguments.

### C.    ATO's Alleged § 1983 Claim & Other Alleged Grounds for Relief

ATO did not plead Section 1983 as an independent claim for relief in its Verified Complaint.  In reality, ATO's Verified Complaint sets forth Section 1983 only as a *basis* for declaratory and injunctive relief.  ATO acknowledged this in its response to the City's motion, by asserting that ATO has satisfied all the "requisites for a § 1983 suit for an injunction . . . and for a declaratory judgment . . . ."   In response to the City's position in its motion for summary judgment that ATO failed to allege a valid property interest to support a Section 1983 claim (a requisite element to establish municipal liability under Section 1983), ATO stated that it has *a justiciable interest in the enforcement of the Clean Air Act and the Supremacy Clause*.

Thus, an independent Section 1983 claim is not before the Court; nor has ATO presented a protected property interest.  However, even if a Section 1983 claim was properly before the Court, ATO's summary judgment argument supporting such a claim hinges on the "property interest" of a *justiciable interest in the enforcement of the Clean Air Act and the Supremacy Clause*.  Assuming, *arguendo*, that this is a valid property interest, ATO simply re-initiates the question of preemption already discussed by the Court.  Because the Ordinance is not preempted by the Clean Air Act, ATO's alleged property interest rights have not been violated.

To be clear, a claim of preemption under the Supremacy Clause does not require a showing that a Section 1983 claim would also be proper.  However, the Court has given due consideration to ATO's claim of preemption under the Supremacy Clause and has found that ATO's claims fail in toto.

The Court need not address other statutes highlighted by ATO in its Verified Complaint and response to the City's motion for summary judgment.  All but one of the remaining statutes mentioned by ATO relate to this Court's jurisdiction to consider the case now before it.  The final statute discusses entitlement to attorneys' fees.  Since ATO's claims have failed as a matter of law, ATO is not entitled to recovery of attorneys' fees.

## IV.    Conclusion

For the aforementioned reasons,  the City's Motion for Final Summary Judgment (Doc. No. 45) is hereby **GRANTED**.  Judgment will be entered by separate document. Fed. R. Civ. P. 58(a).

**SO ORDERED**.

Signed March 28th, 2012.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE